Charles A. WILLOUGHBY and Robert B. Berger, Plaintiffs,

v.

Charles S. PORT and Alban H. Norton, Defendants.

United States District Court
S. D. New York.

March 30, 1960.

Rosston, Hort & Brussel, New York City, for plaintiff.

George E. Brussel, Jr., Alan E. Bandler, Edward Labaton, New York City, of counsel.

Charles S. Port, New York City, for defendants.

DIMOCK, District Judge.

This is a motion by two of a five-man board of directors of Great Sweet Grass Oils Limited, a Canadian corporation, for a preliminary injunction against the voting of proxies alleged to have been obtained by fraud from the stockholders.

It is charged that a letter soliciting the proxies contained misstatements as to the attitude of Mr. George Brussel, American counsel for the corporation. Mr. Brussel had written a letter dated February 12, 1960, to Mr. James H. R. Cromwell, the president of the corporation, respecting a proposed financing arrangement with Mr. Nicholas Salgo. Three paragraphs of this letter follow:

"3. However, from the point of view of shareholders the Salgo proposal is not in their best interests chiefly because it denies them the right to purchase preferred shares and passes to Salgo a measure of voting control incommensurate with the amount of risk capital he intends to commit (when and if he commits it). For $250,000 he will have the right to convert his Bonds into 20% of the voting power (250,000 out of 1,250,000). Our company is conservatively worth $2,000,000. (I place its value at twice that amount). Not only will Salgo control this investment for only a little more than 10% of its minimum intrinsic value, but until he exercises conversion rights his investment will be secured by what is almost the equivalent of a first mortgage on all our assets. (The priorities to Ranger and Empire Trust Co. being relatively small). When you add to this the right to pick up an additional 20% of voting power for $50,000 the proposal does seem unfair to shareholders many of whom paid between $15 and $25 for their shares on the basis of the new common.

"5. I can understand his desire to secure his investment not only for repayment but against a possible reversion to the control of former management whose activities cast our company into disrepute and brought it almost to the brink of ruin. However he knows that he will be purchasing our shares at a bargain basement price and that he can expect to realize a handsome capital gain with-

in a relatively short time and with a minimum of personal risk. In the light of this I believe that as a matter of common fairness to our shareholders he must give them some participation in the preferred on the same terms.

"6. Because he is making a cash investment in our company at a time when secured financing is difficult and unsecured financing almost impossible, I can see the fairness of giving him a part of the preferred larger than what should be offered to our present shareholders. My own opinion is that they should be allowed to purchase one for his two, that is, if as the proposed agreement now stands, Salgo is to have the right to buy up to $975,000 of bonds carrying with it an option to purchase 975,000 preferred, at least 487,500 preferred shares should be set aside for our shareholders. Such a refinancing plan could be defended by us and would not create any control hazards in relation to former management. If the terms of purchase for our shareholders are the same as those offered to Salgo (I think they should be) the rights would undoubtedly be widely if not fully exercised and the voting power that would pass with its exercise would thus be widely distributed. Since it is contemplated that two out of seven places on our Board will go to Mr. Salgo his position would still be fully protected."

The Salgo financing plan referred to in the letter of February 12, 1960, contained the following provision:

"6. We agree that at any time after the Closing you shall have the right to offer to the common shareholders of your Company of record as of the effective date of such offering, in such equitable manner as shall be determined by your Board of Directors, the right to purchase up to $500,000 principal amount of Convertible Bonds (but not preferred Shares) at the face value there-

of, and you hereby agree that you will use your best efforts to make such offering prior to August 31, 1961, in full compliance with the Securities Act of 1933, as amended, and the Trust Indenture Act of 1939, as amended, and in full compliance with the laws of Canada and the United States. If, due to our exercise of the option set forth in paragraph 5 (a) of the Agreement, additional Convertible Bonds are required to be authorized and created to make such offering, you agree to take all such corporate action as may be required in order to authorize, create and issue said additional Convertible Bonds."

After the receipt of the letter of February 12, 1960, the president, to whom it was addressed, succeeded in getting Mr. Salgo to amend the above quoted paragraph 6 of the agreement by striking out the parenthetical expression "(but not preferred Shares)" and substituting "and or 500,000 shares of preferred stock".

Both the American counsel's letter of February 12, 1960, and the agreement as so amended were submitted to a directors' meeting at which four of the five directors were present, the American counsel being the absentee. The agreement was approved for submission to the stockholders with defendant Norton, one of the directors, abstaining.

Defendant Norton and an associate, defendant Charles S. Port, have solicited proxies for the meeting and made use of a leaflet containing a letter from Mr. Port dated March 14, 1960, a statement by Mr. Norton and a memorandum from a stockholders protective committee. The Norton letter quotes the above quoted paragraphs 3 and 5 of the American counsel's letter of February 12, 1960, but omits the above quoted paragraph 6 in which he stated his belief that the stockholders ought to be allowed to purchase one preferred share for Mr. Salgo's two or a total of 487,500 shares.

This partial quotation was followed with the statement "Remember!—This

was the explicit advice and opinion of our American counsel, who obviously had no stomach for this deal—but we can—and must—defeat it."

The letter from Mr. Port referred to the agreement as "This disastrous agreement which your Vice-President and General Manager, Mr. A. H. Norton, and your Company's American Counsel, George Brussel, did not vote for" and said "A committee of stockholders has organized to prevent the approval of what even Mr. Brussel, Cromwell's and Sweet Grass' American Counsel, has described as a 'bargain basement' price for Salgo."

This publicity can only be construed as stating that the American counsel had no stomach for the Salgo agreement that was going to be submitted to the stockholders and that the reason for his disapproval was that Mr. Salgo would obtain value to which the stockholders were entitled. The fact was that the agreement to which the American counsel had referred in his letter was the earlier draft which made no provision of 500,000 shares of preferred stock for the stockholders.

He had evidently had reservations about the agreement other than its tendency to give to Mr. Salgo value to which the stockholders were entitled. In his letter of February 12, 1960, he had said that the draft of the Salgo agreement was not in the best interests of the shareholders "chiefly" because it denied them the right to purchase preferred shares and passed to Mr. Salgo a measure of voting control incommensurate with the amount of risk capital that he intended to commit. Nevertheless it is arguable that if the Salgo agreement had been submitted to him in its final form he would have approved it as conforming to his recommendation in his letter of February 12, 1960. The statement that he had no stomach for it and the implication that his reason was that it gave to Mr. Salgo value that belonged to the shareholders was not justified.

Defendants' proxy material contained another clear implication that the American counsel disapproved the Salgo agreement in its final form. That was the statement that he, like defendant Norton who wrote the letter, had not voted for the Salgo agreement. It would have been just as easy to state the plain fact that the American counsel was not present at the meeting when the agreement was approved.

Those who seek the proxies of their fellow corporate shareholders assume a fiduciary obligation. In re Scheuer, Sup.Ct.N.Y.County, 59 N.Y.S.2d 500; Wyatt v. Armstrong, Sup.Ct.N.Y.County, 186 Misc. 216, 59 N.Y.S.2d 502. Even if the publicity here was defective only in that it did not tell the whole truth, the failure to make a full disclosure would have been a breach of fiduciary obligation. As things stand, I cannot find that any stockholder who sends defendants his proxy is doing so uninfluenced by a false impression that the company's American counsel has given an opinion against the agreement and, at a time when he was afforded an opportunity, has failed to vote for it. Defendants are responsible for any such false impression and consequently cannot have the advantage of the proxies obtained thereby.

Defendants are enjoined from voting proxies obtained as a result of the Port letter of March 14, 1960, and the accompanying statement of defendant Norton and memorandum from the stockholders' protective committee.

Counsel for defendants has written to the court stating that a copy of the American counsel's letter of February 12, 1960, has, since the argument, been sent by the committee to each stockholder. That is not enough to undo the harm. It is too much to expect that every stockholder who had sent the committee a proxy would read the letter or that, even if he did so, he would reach the same conclusion as if the true facts had been presented to him originally and would act upon that conclusion if necessary.

Defendants may, if they wish, send out a new proxy statement stating the respects in which the original was in error and asking for new proxies in a form distinguishable from the old.

Settle order on notice.