B. Agnes BROWN, Alice Debbie Fullenwider and Patrick Marrs, Appellant-Intervenors, in Cook Inlet Region, Inc., Plaintiff,

v.

Jerry WARD, Appellee.

No. 3579.

Supreme Court of Alaska.

March 28, 1979.

Donna C. Willard, Richmond, Willoughby & Willard, Anchorage, for appellant-intervenors.

Ronald A. Offret, Edgar Paul Boyko and Associates, Anchorage, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

MATTHEWS, Justice.

The question in this case is whether shareholder proxies were obtained through materially misleading representations. The superior court held the solicitation in question to be proper and dismissed the complaint below. We disagree and reverse.

Cook Inlet Region, Inc., is an Alaska business corporation formed under AS 10.05. It is designated under the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1628 (Supp.1978) to receive benefits as a regional corporation. Cook Inlet has approximately six thousand shareholders, each owning one hundred shares of common stock.

In anticipation of the 1977 annual shareholders' meeting at which a new board of directors was to be elected, appellee Ward, a shareholder of Cook Inlet, prepared and mailed two separate requests for proxies to fellow shareholders. The first proxy request, which produced a minimum of 153 proxies, is not challenged here. The second proxy solicitation, which was sent to all shareholders, produced a far greater number of proxies.[1] The statements made by Ward in the materials accompanying the second solicitation are the subject of this appeal.

Cook Inlet, alleging that Ward had procured the proxies by the use of materially false and misleading statements in the second solicitation, filed suit to enjoin Ward from voting the proxies which he obtained. A preliminary injunction was granted which ordered that the validated proxies be voted but segregated and that the existing board of directors remain in office pending the outcome of the trial on the merits. At the trial, after Cook Inlet presented its case, Ward moved for an involuntary dismissal under Civil Rule 41(b). The superior court granted the motion and entered judgment declaring that the proxies were valid and that the votes cast pursuant to them were to be given effect.

Cook Inlet decided not to appeal the superior court's ruling. Appellants, who would have been elected to the board were it not for the voting of Ward's proxies, moved to intervene pursuant to rule 24(a), Alaska Rules of Civil Procedure, in order to prosecute an appeal. The superior court denied the motion. We granted appellants' petition for review and held that the trial court erred in not granting the motion to intervene. *Brown v. Cook Inlet Region, Inc.,* 569 P.2d 1321 (Alaska 1977).

Ward's second proxy solicitation began with a cartoon depicting a crowd of Cook Inlet shareholders telling management, "Hey! We want our money *NOW*." It continued in part as follows:

> We own Cook Inlet Region Inc. not the leaders and Lawyers.
>
> If we each want a big chunk of Land then let's give it to ourselves *"NOW"* not 20 years from Now. We the stockholders own the Land not the leaders and Lawyers.
>
> It has been estimated that just the coal reserves owned by us is worth over 2 Billion Dollars. I say "so what" how does that help us. If we were to go ahead and sell just the coal for its estimated value that would be over Three hundred thousand dollars "Look at this number $300,-000.00" for every man, woman, and child owner of Cook Inlet Region Inc.
>
> . . . . .
>
> Our leaders and Lawyers say invest, so what do we the owners of Cook Inlet Region Inc. have after 5 years. We have a piece of white man paper that says we have millions of dollars, yes Millions of dollars of warehouses, Lawyer fees, several old Hotels, "which you can't even sleep in without lots of money," more

---

1. Ultimately, Ward obtained approximately 1,100 proxies from both solicitations. Eight hundred of these were validated.

Lawyer fees, a great Big Multi-Million dollar white man office building where our leaders can spend our money in comfort AND who knows what else our money is spent on.

I say lets get out of white man business, sell All this stuff and invest the money with the people. This would mean THOUSANDS of dollars for each and every one of us *NOW* not 20 years from now.

We the stockholders own Cook Inlet Region Inc., and we own all the cash and all the minerals and all the land NOT the leaders and Lawyers.

Appellants contend that the following portions of Ward's solicitation were materially false or misleading:

1. The statement that the corporation could presently give each shareholder "a big chunk of land."

2. The statement that the corporation could sell coal reserves and receive $300,-000.00 for each shareholder, with the implication that this could be accomplished in the reasonably near future.

3. The statement that thousands of dollars in cash could be distributed to each shareholder if the real estate investments of the corporation were liquidated.

The trial court concluded in its ultimate finding of fact that the solicitation material complained of was neither untrue nor misleading, and that it "expresses solely a philosophical difference between plaintiff and defendant." However, the trial court found that as of the trial date Cook Inlet owned surface rights to only 56 acres of land and approximately 7,000 acres of mineral rights, representing less than 1% of what it eventually would receive under the Alaska Native Claims Settlement Act. The court further noted that it was uncertain when future conveyances would be made. The court found that if all the investments presently owned by Cook Inlet were sold,

$6,000,000, or less would be realized and that Cook Inlet does not "have any present ability to distribute big chunks of land, or thousands of dollars, to each of its shareholders."

■ Since Cook Inlet is expressly exempted from the federal Securities Act of 1933 and the Securities Exchange Act of 1934,[2] Alaska law governs this case. When Ward requested the proxies there existed no Alaska statute prohibiting false statements in proxy solicitations. AS 45.55.139, which became effective shortly after the solicitation in this case, provides:

*Reports of corporations.* A copy of all annual reports, proxies, consents or authorizations, proxy statements and other materials relating to proxy solicitations distributed, published or made available by any person to at least 30 Alaska resident shareholders of a corporation which has total assets exceeding $1,000,000 and a class of equity security held of record by 500 or more persons and which is exempted from the registration requirements of § 70 of this chapter by § 138 of this chapter, shall be filed with the administrator concurrently with its distribution to shareholders.

AS 45.55.160 which now applies to proxy statements filed under § 139 prohibits materially false solicitations:

*Misleading filings.* It is unlawful for a person, in a document filed with the administrator or in a proceeding under this chapter, to make or cause to be made an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

The common law also requires that proxy solicitations be free from materially false or misleading statements.[3] The decision of the court below accepts this principle, and

---

2. The exemption is set forth in 43 U.S.C. § 1625 (Supp.1978).

3. *In re R. Hoe & Co., Inc.,* 14 Misc.2d 500, 137 N.Y.S.2d 142 (1954); *Kaufman v. Schoenburg,* 33 Del.Ch. 211, 91 A.2d 786 (1952); *Empire So.*

*Gas Co. v. Gray,* 29 Del.Ch. 95, 46 A.2d 741 (1946); *Wyatt v. Armstrong,* 186 Misc. 216, 59 N.Y.S.2d 502 (1946); *In re Scheuer,* 59 N.Y. S.2d 500 (Sup.1942).

none of the parties disagree. The fraud rule promulgated by the Securities and Exchange Commission contains no different substantive command:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.[4]

 Since the SEC fraud rule and the common law both prohibit material falsehoods, authorities construing the SEC rule are a useful guide in determining when a misstatement is material under Alaska common law.[5] Federal authorities have established that a misrepresentation is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.[6] Subjective proof that one or more shareholders actually granted a proxy because of a falsehood is not required; only the objective standard encompassed in the definition of materiality need be met:

Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.[7]

In this case the court below found that Cook Inlet did not have large amounts of land or assets which it could distribute to shareholders. Ward represented that it did. Moreover, the solicitation plainly implies that coal reserves could presently be sold and sums of money on the order of magnitude of $300,000 realized for distribution to each shareholder. Although Cook Inlet will receive lands containing large amounts of coal, it had not obtained title to them as of the trial. No one can predict when, if ever, the coal can be economically mined. Assuming that extraction is economically feasible, it will take a long period of time, and 70% of the revenues from such a venture must be distributed among all 12 regional corporations organized under the Alaska Native Claims Settlement Act.[8] There is no present prospect of selling the coal reserves for a current price which might result in anything approaching $300,000 to each shareholder.

The trial court found that the proxy solicitation representations were not materially misleading, but, instead expressed "solely a philosophical difference between plaintiff and defendant." We find this conclusion to be clearly erroneous. While the trial court did not expressly state the standard of ma-

---

**4.** 17 C.F.R. § 240.14a–9 (1978).

**5.** See Loss, *The SEC Proxy Rules and State Law,* 73 Harv.L.Rev. 1249, 1264–65 (1960); Comment, *Standards of Disclosure in Proxy Solicitation of Unlisted Securities,* 1960 Duke L.J. 623, 635–36.

**6.** *T.S.C. Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 765 (1976). Common law concepts of materiality are not in essence different. See Restatement (Second) of Torts § 538(2):

The matter is material if
(a) a reasonable man would attach importance to its existence or nonexistence in de-

termining his choice of action in the transaction in question; or
(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.

**7.** *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593, 602 (1970); see also *Union Pac. R.R. Co. v. Chicago & N. W., Ry. Co.,* 226 F.Supp. 400, 411 (N.D.Ill. 1964); *In re Scheuer,* Sup., 59 N.Y.S.2d 500 (1942).

**8.** 43 U.S.C. § 1606(i) (Supp.1978).

teriality which it applied in reaching that conclusion the proper standard is the objective one described above: a misleading or false statement "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *T.S.C. Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 499, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976).

Applying this standard of materiality in this case, we think it beyond argument that the misrepresented ability of Cook Inlet to distribute money or land to shareholders on the scale expressed in the solicitation would be likely to influence shareholders to grant proxies to Ward. There are very few people who, as owners of a small percentage of a large corporation, would not consent to a change in corporate management if doing so would result in immediate personal wealth. Since we find Ward's proxy solicitations to be materially false as a matter of law, no further evidence need be received by the trial court on the question.

The judgment is reversed and the case is remanded for a determination of what further relief, if any, may now be appropriate.

CONNOR, Justice, dissenting.

I must respectfully dissent.

It should be noted that the leaders of Cook Inlet initially did not regard Ward's letter as posing a serious problem for the corporation. Roy Huhndorf testified that when he received Ward's letter on about April 12, he did not take immediate action, although he thought the letter was grossly misleading. It was only later, when it appeared that Ward was gathering an appreciable response, that a decision was made to seek injunctive relief. In addition, Huhndorf circulated a letter to the shareholders replying to Ward's assertions. It read:

"Recently, you may have received proxy solicitation statements which were designed to mislead the reader into believing that large sums of money and large tracts of land are readily available for distribution to the stockholders. These statements are totally deceptive and irresponsible.

. . . In fact, the land our Region is entitled to is not available for liquidation as it has not yet been conveyed to us because of court actions. Additionally, by law 70% of all subsurface and timber resources developed from our land must be distributed to all other regions. It requires a daydreamer's imagination as well as a great deal of misinformation in order to conclude that each stockholder would receive the huge benefits outlined in the solicitation.

The thought of liquidation raises more questions than there are answers. For example, if the land is divided between all present shareholders who will get the most valuable lands? What will be left to pass on to our children and our future generations? How can we sell specifically named coal fields when we do not yet have title to the lands? What about taxes?—if it were possible for each shareholder to receive $300,000 what would each shareholder end up with after taxes? What would be the impact on the real estate market if 1.2 million acres went on the market? How much would the sale value decrease if the State and Cook Inlet marketed lands at the same time?

It is my belief that the shortest route to prosperity for the stockholder is to continue on the present course of building a strong organization through careful planning and thoughtful investments. There is no shortcut to riches. Persons advocating get-rich-quick schemes should have *no* role in the management of your corporation."

Under the Alaska Native Claims Settlement Act, Cook Inlet is entitled eventually to receive on behalf of its shareholders approximately 1.5 million acres of land and $75 million in cash from the Alaska Native Fund. As of the date of trial, Cook Inlet had obtained 56 acres of surface land, approximately 1,000 subsurface acres, and $25,000,000. The land conveyances represent less than 1% of Cook Inlet's land entitlement. The timetable for future con-

veyances is uncertain.[1] The $25 million was received from the Alaska Native Fund, of which $13.5 million was distributed to shareholders or village corporations as mandated by the Act; $5 million was used for administration and expenses incurred in the land selection process; and the remaining $6 million was invested in various commercial properties and business ventures. The trial court found that if all the investments owned by Cook Inlet were sold at the time of trial, $6 million or less would be realized.

Ward's letter stated that coal reserves owned by Cook Inlet had an estimated value of $2 billion. The value of the coal reserves was vigorously disputed at trial. Michael Smith, director of the Alaska Division of Lands, testified that there is an estimated 550 million tons of proven coal reserves on land Cook Inlet was to receive. A significant portion of that land was under either mineral leases or prospecting permits, but mining had not yet begun. Although there may also be potential coal reserves which would increase the value, Smith estimated $38.2 million as the most optimistic value to be expected from the proven reserves at a $.10 per ton royalty rate. Smith also testified that the marketability of the reserves was still in doubt because of tremendous mining and shipping costs and a competitive coal market. He noted that even if mining began immediately, it would take 50 or 100 years to mine the proven reserves, so the royalties would be spaced out over a substantial period of time.

Huhndorf testified that Cook Inlet had received varying estimates on the coal reserves, ranging from $3 million to $4 billion. Even if income were realized from the proven reserves, the distribution requirements of the Alaska Native Claims Settlement Act would leave Cook Inlet with only 36% of the acquired revenues.[2] Corporate income taxes would further reduce the pro-

ceeds before distribution to shareholders. Huhndorf believed that Ward's $2 billion estimate was misleading because shareholders might consider that sum as readily available, but he could not say the statement was false.

Ward, called by Cook Inlet, stated that he learned of the $2 billion figure from newspaper accounts of a study conducted by Harold Galliett. Newspaper accounts were also credited for providing Ward with the $300,000 per shareholder figure that the coal revenues would provide. Galliett, a defense witness and a consulting engineer who is a plaintiff in an action contesting the legality of the Cook Inlet land exchange, and Don McGee, a petroleum geologist for the state, called by Cook Inlet to rebut Galliett's testimony, both testified as to the differing estimated values of the reserves.

Huhndorf believed it was false and misleading for Ward to entice shareholders with land and money "now", when there was none to be given. Ward, on the other hand, testified that he was distressed over what he considered poor investments. He thought management should distribute rather than invest incoming funds. He knew that all the allotted land had not been conveyed, but felt management was responsible for the delay. Further, Ward testified that he had no intent to mislead shareholders, nor had he in fact done so.

At the close of Cook Inlet's case, Ward moved for a dismissal of the action. Since witnesses Galliett and McGee had been called out of turn, it was stipulated that the trial court would not consider their testimonies. Although the judge found that Cook Inlet did not have the "present ability to distribute big chunks of land, or thousands of dollars, to each of its shareholders," the motion was granted.

1. Delays were caused by administrative delay in the Department of Interior, land selection disputes currently pending before the Alaska Native Claims Appeal Board, and the filing of various lawsuits contesting conveyances under the Alaska Native Claims Settlement Act.

2. Section 7(i) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1606(i) (Supp. V. 1975), requires that 70% of the revenues realized from the sale of subsurface resources be distributed among the 12 regional corporations with an additional 6% for the distributing corporation.

The court observed that a real philosophical difference existed between the contending forces, that some of Ward's language was bombastic, but that the communication in question was not misleading or fraudulent. The court concluded that, as a matter of law, Cook Inlet had not made a prima facie case entitling it to the permanent injunctive relief requested.

Appellants argue that federal securities law provides the appropriate standard for testing the misleading quality of Ward's solicitation material and that, therefore, the trial court erred in not applying federal law to test the sufficiency of Cook Inlet's prima facie case. Ward, on the other hand, contends that since native corporations are exempt from the federal securities laws, the principles of common law fraud apply.

Normally, a corporation of this size might be governed by the 1934 Securities Exchange Act. 15 U.S.C. § 78a (1976). Section 14(e) of the Act prohibits solicitations containing any false and misleading statements regarding material facts.[3] However, in January, 1976, Congress enacted 43 U.S.C. § 1625, which exempted native corporations from the federal securities laws for the 20 year period that the stock will be inalienable.

One rationale for the federal exemption is that because the native corporation stock is non-transferable for 20 years, there is no reason to subject the corporations to the expense and administrative burden of compliance with the securities acts. The purpose of those acts was not only to protect shareholders, but also to have the commission and the investing public fully informed about the securities of publicly traded companies, and thus to assure that there is no distortion of market values. H.R.Rep.No. 94–729, 94th Cong., 1st Sess. reprinted in 1975 *U.S.Code Cong. & Admin.News*, pp. 2376, 2386. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1973), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Native corporation stock has no market for 20 years, so there is no possible adverse effect in the open marketplace by the lack of federal regulation.

Congress also believed that the securities acts would not fulfill their intended purpose in the native corporation context. Assuming that many native shareholders lacked sophisticated business acumen, Congress feared that the securities acts' tight restrictions on communications would virtually preclude any meaningful or simplified discussion at the village or community level. 1975 *U.S.Code Cong. & Admin.News, supra*, at 2385. But passage of the exemption was coupled with a warning that federal regulation might be imposed if it were found necessary.[4]

Although native corporations are subject to Alaska's corporations laws, Alaska has no regulation of proxy solicitation comparable

---

3. 15 U.S.C. § 78n(e) (1976).

4. The Congressional committee report (Interior and Insular Affairs Committee) states:

"Finally, the Committee understands that the general provisions of Alaska law provide protection for Native stockholders from any corporate mismanagement and misrepresentations or omissions to represent in connection with sales of securities, and that Alaska courts would look to precedents under federal securities laws for appropriate standards of conduct by management and other persons connected with securities transactions. Native corporations have assured the Committee that they do not intend to seek an exemption from state securities laws on the basis of this exemption from federal laws and intend to pursue the passage of State legislation to the extent necessary to provide any appropriate additional protection. Therefore, it is not necessary at this time to impose additional federal requirements.

It should be noted that these corporations are being exempted from the federal securities laws on the understanding that federal regulation of Settlement Act corporations is not necessary to protect Native stockholders or the public during the twenty-year period when Native-owned stock cannot be sold. However, if this assumption proves invalid in light of experience, the Committee is prepared to re-impose such provisions of the federal laws as may be necessary. In short, the twenty-year exemption should be viewed by the Natives as an experiment which will be stopped if it is abused."
1975 *U.S.Code Cong. & Admin.News, supra*, 2386–87.

to the federal law. *See* AS 10.05.005; AS 10.20.007. AS 10.05.159 authorizes voting by proxies, but sets no guidelines for solicitation.[5] *See Calista Corporation v. DeYoung*, 562 P.2d 338 (Alaska 1977).

Against this background appellants argue that Congress intended federal securities law precedents to govern these proxy solicitations.[6] I am unable to read the Congressional mandate so broadly. It is apparent that Congress did require that native corporations not be subjected to complex and expensive requirements of federal law as to corporate mergers.[7] Congress did require that native corporations submit annual reports to shareholders which should be as revealing of corporate affairs as those required of companies regulated by the federal securities laws. 43 U.S.C. § 1625 (Supp. V. 1975). Congress also evinced a desire to protect against misrepresentations in connection with the sale of securities. It is in connection with these two subjects that the Congressional committee report states an understanding that Alaska courts would look to precedents under federal securities law for guidance. It is not at all clear that Congress intended federal law standards to apply to proxy solicitations such as those at issue in this case.

We should not utilize the sophisticated rules developed in federal securities law over the last 45 years as the law of Alaska.

---

**5.** Newly enacted AS 45.55.139 requires that proxy materials be submitted to the administrator (the commissioner of commerce and economic development or his designee. AS 45.55.-130(1)), when they are distributed to shareholders. However, this law did not become effective until May 27, 1977. Section 2, ch. 58, SLA 1977. The solicitation at issue here was mailed on April 10, and therefore, is not subject to AS 45.55.139.

**6.** Under federal law, appellants would have to show a misstatement or a misleading statement of material fact. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 383, 90 S.Ct. 616, 621, 24 L.Ed.2d 593, 601 (1970). Materiality is an objective question. The test is whether there is a substantial, realistic likelihood that the statement may have led a shareholder to grant a proxy to or withhold a proxy from the other side, whereas without the solicitation material he would have taken a contrary course. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445–46, 96 S.Ct. 2126, 2130–31, 48 L.Ed.2d 757, 763–69 (1976); *See also, Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Chris-Craft Industries v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1973), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). It is proper to consider the "total mix" of information presented to the shareholders as well as the proxy material particularly in question. *TSC Industries, Inc. v. Northway, Inc., supra* at 449. Once materiality is shown, the actual reliance and the causal connection between the solicitation and the shareholder action is assumed. *Mills v. Electric Auto-Lite Co., supra*, 396 U.S. at 384–85, 90 S.Ct. 616. It does not matter whether the one soliciting the proxies is management or an insurgent. *See generally, Studebaker Corporation v. Gittlin*, 360 F.2d 692 (2d Cir. 1966). This prima facie case is considerably easier to prove because the goal is to provide as much protection to shareholders as possible. Although the courts have not used this standard in non-securities act cases, some commentators have advocated its use. One suggested approach is that since the securities laws are part of the "law of the land" under the Supremacy Clause, the states should use them in formulating local laws. Loss, "The SEC Proxy Rules and State Law" 73 Harv.L.Rev. 1249, 1263 (1960). Another view is that:

"Representing, as they do, the combined knowledge of experts in the field of securities regulation and the product of exhaustive research, it appears that, even in the absence of legislation, the rules of the Securities and Exchange Commission should be used in the state courts as a guide to what is practical and desirable practice."

"Standards of Disclosure in Proxy Solicitation of Unlisted Securities," 1960 Duke L.J. 623, 636.

**7.** "Conversely, the tight restrictions of the 1933 Act on the verbal communications which may be made in conjunction with the prospectus virtually preclude any meaningful or simplified discussion at village or community meetings in order to explain merger to the stockholders. Thus the 1933 Act requires for disclosure an extremely complex and expensive document which does not serve its intended purpose at least as to Native corporations, but also precludes the one effective means of communication.

Similarly, application of the 1934 Securities Exchange Act is not necessary during the period when Native stock is inalienable. . . . For the reasons discussed above under the 1940 Act, these requirements [detailed proxy statements] again have little proper application to Native corporations and do not fulfill their intended purpose in this context."

1975 *U.S.Code Cong. & Admin.News, supra* at 2385–86.

It is illogical to conclude that when Congress exempted native corporations from federal securities law it nevertheless intended all of that law to apply there. Certainly there is no reason, in law or policy, why Alaska must march in lockstep with the federal government on this subject. What matters is that substantial fairness be assured under Alaska law in the matter of proxy solicitations.

Ward contends that since Congress intended state law to control, in the absence of a statute, the elements of common law fraud and misrepresentation should control.[8] However, the few courts which have addressed this issue have not so held. Rather, they have taken a compromise position between the federal standard and the common law tort of misrepresentation. *See* "Standards of Disclosure in Proxy Solicitation of Unlisted Securities," *supra*, n. 6, at 623; Aranow and Einhorn, "State Court Review of Corporate Elections," 56 Col.L. Rev. 155 (1956).

New York has had the most case law in this area. *In Re Scheuer*, 59 N.Y.S.2d 500 (Sup.1942), was an action by an aggrieved shareholder to have proxies invalidated because the solicitation material reported that certain new equipment expenditures had been deducted from gross earnings when, in fact, they were charged to capital. The court found that the actions of those engaged in securing the proxies had deviated from "the exacting standards of fairness" required in proxy solicitation and were misleading, whether done "carelessly, recklessly, or deliberately." 59 N.Y.S.2d at 501. Unfortunately, these standards were not further described. *Continental Bank & Trust Co. v. 200 Madison Ave. Corp.*, 43 N.Y.S.2d 402 (Sup.1943), added that the alleged misrepresentation must be material such as to "influence any layman to give a proxy where he would not otherwise have done so." 43 N.Y.S.2d at 407–8. *Wyatt v. Armstrong*, 186 Misc. 216, 59 N.Y.S.2d 502 (1945), reasserted the *Scheuer* test. It held

that proxies solicited without notification that the nominees, if elected, intended to resign was a concealment tantamount to fraud and misrepresentation. The test was whether the solicitation was "so clouded with doubt or tainted with questionable circumstances that the standards of fair dealing" were abused, depriving shareholders of the knowing freedom to vote. 59 N.Y.S.2d at 505, 508.

The last in this line of cases was *In Re R. Hoe & Co.*, 14 Misc.2d 500, 137 N.Y.S.2d 142 (1954), aff'd, 309 N.Y. 719, 128 N.E.2d 420 (1955). After an election of directors, the displaced management sought to have the election set aside because the winning shareholder insurgents had made misrepresentations about management in their proxy solicitation material. The court found that there was a factual basis for the shareholders allegations against management. Management had fully availed itself of the opportunity to present its view to the shareholders. And, though the fight was bitter, the solicitation was not so tainted with fraud as to require judicial intervention to avoid an inequitable result. The court noted that "a certain amount of innuendo, misstatement, exaggeration and puffing must be allowed as a natural by-product of a bitter campaign." 137 N.Y.S.2d at 147–48. *See also, Bresnick v. Home Title Guaranty Company*, 175 F.Supp. 723 (S.D. N.Y.1959).

The view that shareholders would be better protected if the standard of proof for misleading proxy solicitation material were less rigorous than common law misrepresentation was best stated in *Willoughby v. Port*, 182 F.Supp. 496 (S.D.N.Y.1960). There, two directors sought a preliminary injunction against another director's use of proxies he had solicited, claiming that the director had misstated the attitude of corporate counsel. The court said:

"Those who seek the proxies of their fellow corporate shareholders assume a fidu-

8. AS 01.10.010 provides:

"*Applicability of common law.* So much of the common law not inconsistent with the Constitution of the State of Alaska or the

Constitution of the United States or with any law passed by the legislature of the State of Alaska is the rule of decision in this state."

ciary obligation. Even if the publicity here was defective only in that it did not tell the whole truth, the failure to make a full disclosure would have been a breach of fiduciary obligation. As things stand, I cannot find that any stockholder who sends defendants his proxy is doing so uninfluenced by the false impression . . . . Defendants are responsible for any such false impression and consequently cannot have the advantage of the proxies obtained thereby." (citations omitted)

182 F.Supp. at 499.

In *Western Oil Fields, Inc. v. McKnab*, 232 F.Supp. 162 (D.Colo.1964), a shareholder sought proxies to displace existing directors. The court first held that because Congress had not seen fit to include corporations of this size in the coverage of the securities acts, it would not use any federal law derived from those acts. 232 F.Supp. at 164. Noting the lack of state law in this area, the court denied relief. It held that although there were some inaccuracies and innuendos, management had failed to demonstrate that fraud enabled the defendants to secure proxies. 232 F.Supp. at 165. The elements of the prima facie case which can be derived from *McKnab* are: (1) the statement must be false; (2) the statement must be significant and material such as to influence a shareholder to give a proxy where he would not otherwise do so; and (3) some shareholder must actually be misled. 232 F.Supp. at 166. The third element is vague, since the court merely noted that there was no testimony to that effect. As in *In Re R. Hoe & Co., supra*, the court stressed the bitter nature of such fights and the factor that management had answered the charges raised against it. It likened the contest to a political election where a certain amount of literal truth had to give way.

These cases reflect competing policies. There is the desire to give some latitude to shareholder insurgents to offset shareholder inertia and management entrenchment. At the same time it is necessary to draw a line as to how much puffing or exaggeration is tolerable. Certain strands tie all these cases together. First, it appears to make a difference whether the suit is brought by displaced management or an aggrieved shareholder. When it is a suit by a shareholder against management, the policy of protecting the shareholders is of more weight than would otherwise be the case. In a management initiated suit, more regard is given to the difficult task insurgents have against an established management.

In the case at bar, the suit was brought by the threatened management. Suit was not filed until it appeared that the proxy challenge might be successful, rather than when the misleading statements were issued. The trial court thought this was an important factor.

Next, the information offered by management to counter the solicitation material tends to offset the harm caused by the insurgent's excesses. Roy Huhndorf's letter to the shareholders fully explained why he thought Ward's letter was misleading. Last, a certain amount of exaggeration is to be expected. In small corporations not regulated by the securities laws, it may even be beneficial to the goal of shareholder involvement. *In Re R. Hoe & Co., supra; Western Oil Fields, Inc. v. McKnab, supra.*

Ward's statement is definitely replete with exaggeration and puffing. But, under the *Hoe-Bresnick* test described above, it is not so tainted by fraud that an inequitable result was achieved. Although he wrote that money and land would be immediately available, he testified that he was referring to the $6,000,000 in outstanding corporate investments which he believed should have been paid out to the shareholders rather than invested. He states that he used the word "now" as "a rallying cry indicating intention, rather than present ability," to reflect his view that "the corporation should be working for the good of the shareholders, not to build a bureaucratic empire." The trial judge interpreted Ward's statements as reflecting a valid policy dispute.

The most offending statement is that if the estimated $2,000,000,000 in coal reserves were distributed, it would mean $300,000 per shareholder. In fact, title to the land containing the coal reserves had not then been obtained. The actual amount of coal is unknown. Much of the land is under existing mineral leases with a low royalty. Even if the $2,000,000,000 figure were an accurate value, the income would have to be spread among all the regional corporations, and would be subject to corporate tax. The $300,000 per shareholder figure could not likely be realized. The record reflects, though, that those figures were publicly known estimates.

Even with these factual distortions, the statement as a whole should not invalidate the proxies under the *Hoe-Bresnick* view. In my opinion, Ward's proxy solicitations did not go beyond permissible bounds. I am persuaded that under the balancing process developed in the case law discussed above, the solicitations amounted to puffing or argumentative exaggeration, but they did not amount to misrepresentation such as to invalidate the proxies. In my view, the trial court did not err in its ruling that Cook Inlet had failed to make a prima facie case.[9]

I would affirm the superior court.

---

**9.** I favor a rule which permits vigorous debate rather than one which stifles it. This is particularly important in the case of native corporations. The shareholders of those corporations may not have a high degree of business experience. To impose rigid, constrictive rules as to proxy solicitations may lead to the stifling of effective communication between dissident shareholders and other shareholders.