Pat SIERRA, Appellant,

v.

GOLDBELT, INC., Appellee.

No. S–8961.

Supreme Court of Alaska.

June 29, 2001.

Rehearing Denied Aug. 14, 2001.

Fred W. Triem, Petersburg, for Appellant.

Eric A. Kueffner, Faulkner Banfield, P.C., Juneau, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, and BRYNER, Justices. [CARPENETI, Justice, not participating.].

## OPINION

EASTAUGH, Justice.

## I.  INTRODUCTION

Did the Alaska Native Claims Settlement Act (ANCSA)[1] permit Goldbelt, Inc., a Native corporation, to issue shares to particular groups of Native elders without consideration? And if it did, did Goldbelt satisfy its disclosure duty in the proxy statement that solicited votes for the elder benefit program? As to the first issue, this court unanimously holds that ANCSA authorizes issuance of such shares. As to the second issue, the four participating members of the court are equally divided, and the court therefore affirms the superior court's judgment granting complete summary judgment to Goldbelt.

1.  See 43 U.S.C. § 1601 et seq. (1986 & Supp. 2000).

2.  43 U.S.C. § 1606(g)(2)(B)(iii)(I), (II) (1986 & Supp.2000).

3.  See 43 U.S.C. § 1607(c) (1986 & Supp.2000).

4.  See 43 U.S.C. § 1629b (2000); see also Hanson v. Kake Tribal Corp., 939 P.2d 1320, 1324 (Alaska 1997) (ANCSA amendments "authorize the issuance, without consideration, of a special class of stock for shareholders who had attained the age

## II.  FACTS AND PROCEEDINGS

Goldbelt, Inc. was incorporated in 1974 as an ANCSA-authorized urban corporation with a single class of authorized capital stock. In 1987 Congress amended ANCSA to allow regional corporations to amend their articles of incorporation to authorize the issuance and redemption of new and different classes of stock that could be restricted to "Natives who have attained the age of sixty-five" and "other identifiable groups of Natives ... defined in terms of general applicability and not in any way by reference to place of residence or family."[2]  These provisions also applied to village and urban corporations.[3] Any proposed amendment to the articles of incorporation approved by the corporation's board of directors must be approved by the shareholders.[4]

In a 1994 advisory vote, a majority of Goldbelt shareholders who voted indicated that they favored an elder benefit program that would provide not less than $1,000 per elder.  In 1995 a proposed amendment to the articles of incorporation that would have authorized a new class of stock for elders was not approved by a majority of the shareholders.  Contemporaneously proposed amendments that would have authorized issuing stock to new Natives and to Natives who were left out of the original settlement also failed.

In 1996 Goldbelt again sought to amend its articles of incorporation to authorize issuing preferred stock to elders who owned original Goldbelt stock.  This time the corporation focused solely on the elders' benefit and did not pursue benefits for new Natives or for those who had been left out.[5]  The board passed a resolution that approved an amendment to authorize issuance of 100 shares of elder stock to each Native who "has attained

of sixty-five.  However, creation of such stock requires a shareholder vote or an amendment to the articles of incorporation.") (citations omitted).

5.  Carl C. Nelson, a member of the Goldbelt shareholders relation committee, explained the strategy and expressed his "hope that by separating the issues, shareholders [would] have the confidence to pass the amendment."

the age [of] 65 or more and who holds Settlement Common Stock that was not acquired through gift, inheritance or purchase or who transferred such Settlement Common Stock by inter vivos gift."

The resolution provided, in part:

WHEREAS, the amendments to the Alaska Native Claims Settlement Act permit the corporation to amend its articles of incorporation in order to provide benefits to elders in the form of additional stock other than Settlement Common Stock; and

WHEREAS, the Board of Directors does not wish to create a Settlement Trust, but instead wishes to establish the authority to issue additional preferred stock to elders in accordance with the terms of the 1991 Amendments to the Alaska Native Claims Settlement Act; and

WHEREAS, the preferred stock shall be issued to elders and redeemed on such terms as are authorized by 43 U.S.C. § 1606(g)(2) and at such times and on such terms as the Corporation determines to be consistent with sound fiscal management; and

WHEREAS, the preferred stock shall be redeemable and the Board of Directors anticipates that the redemption price will be $10.00 per share so that each elder to whom 100 shares are issued would be entitled to a payment of $1,000.00,

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors approves the following amendment to the articles of incorporation of the corporation and directs that the amendment be submitted to a vote of the shareholders at the next annual meeting, with a recommendation that the shareholders approve the amendment:

AMENDMENT TO ARTICLE IV of the Restated Articles of Incorporation of Goldbelt, Incorporated.

ARTICLE IV is hereby amended to read as follows:

. . . .

C. The Corporation shall be authorized to issue 400,000 shares of Elders Stock. The shares of Elders Stock shall be non-voting stock without par value, shall be deemed fully paid and non-assessable upon issuance, and the Corporation expressly waives any requirement of consideration for the shares. Elders Stock shall be issued pursuant to such standards and procedures as may be adopted by the Board of Directors to any Native (as that term is defined in the Settlement Act) who has attained the age of 65 or more and who holds Settlement Common Stock that was not acquired through gift, inheritance or purchase or who transferred such Settlement Common Stock by inter vivos gift. The Corporation shall be authorized to issue one hundred shares of Elders Stock to each Native who meets the qualifications set forth herein. Elders Stock shall not be issued to any person before January 1 of the year following the year in which the person reaches the age of sixty-five.

D. Shares of Elders Stock issued by the Corporation shall

1. be redeemable, in whole or in part, at the option of the Corporation. The Board of Directors is hereby authorized and required to fix, in the manner and to the full extend provided and permitted by law, the redemption price or prices, if any, for the shares of Elders Stock, and

2. not pay dividends or distributions. The holders of Settlement Common Stock shall be entitled to receive such dividends as may be declared by the Corporation, and

3. not be sold, pledged, or assigned in present or future, nor shall inchoate rights thereto, and present or future rights to receive dividends therefrom be sold, pledged or assigned.

In addition, the Board provided the following proxy statement soliciting shareholder votes for the approval of the amendment:

III. Amendment to the Articles of Incorporation to provide Elders Stock

The Elders Stock amendment would allow a one time issuance of 100 shares to original Goldbelt shareholders who reach the age of 65 years or have already reached that age. The Elders Stock would be issued whether or not the person pres-

ently owns any shares; if someone was issued original shares and is over 65 on or after the date of adoption of the amendment, that person will be entitled to Elders Stock after January 1 of the year after he or she turns 65.

Elders Stock would not be issued to Natives who were never issued original Goldbelt Settlement Common Stock, and would not be issued to the estates or heirs of original shareholders who never reached the age of 65. If a shareholder inherited or was gifted stock from a parent or relative, for example, and was not issued original Goldbelt stock, he or she will not be eligible to receive Elders Stock.

It is anticipated that Elders Stock would be issued and then immediately redeemed by the corporation, so that no new stock certificates will be issued. Instead, a check for the redemption amount would be sent to all of those eligible to receive the Elders Stock. Elders Stock would be nonvoting preferred stock. It would not be transferable and would not pay future dividends because of its prompt redemption.

If a majority of outstanding shares vote to adopt this amendment to the Articles, then the corporation will be permitted to issue Elders Stock in the format described above. The financial effect of the issuance of this stock would be to reduce the value of stock now held by Goldbelt shareholders. This reduction is known as dilution, and would affect shareholders in two ways:

Dividend dilution—Since there will be more stock eligible to receive distributions, the existing shareholders may receive smaller dividend and distribution checks.

Market value dilution—At present, Goldbelt stock cannot be sold. But, if in the future Goldbelt stock can be sold or if the corporation merges or is dissolved, the value received by Goldbelt shareholders for their shares will be lower if new stock is created.

Goldbelt estimates that approximately 250,000 shares of new Elders Stock will be issued and redeemed over a 40 year period. In the next year, 27,000 shares will be issued, with similar amounts issued in the years to follow, gradually decreasing until the program ends about 40 years later. If the shareholders approve the amendment, the most significant effect will come in the first year after the issuance of Elders Stock. The issuance of the stock, followed by its redemption, will result in a reduction of funds available for investment, for dividends, or for other corporate activities. The extent of the impact depends on the amount authorized for redemption of the shares, which cannot be predicted with any accuracy. As with dividend payments, the decision of the redemption amount will be based upon available funds, the number of recipients, and the corporation's financial needs at the time.

The Board of Directors recommends adoption of the amendment to provide for Elders Stock.

At the 1997 annual meeting, the shareholders voted to approve the amendment by a vote of 144,485 for and 71,862 against. A board resolution then approved the issuance of 100 shares to each eligible elder and authorized prompt redemption of those shares at $10 per share.

Pat Sierra, a Goldbelt shareholder who alleged she has not received all of the distributions made by the corporation, became the plaintiff in a direct action filed against the corporation after the 1997 election. Sierra's suit, filed for herself and on behalf of similarly situated shareholders, contested Goldbelt's creation of the elders' stock program.[6] Goldbelt moved for summary judgment, arguing that Sierra had failed to state a cause of action in any of her several claims. Over

---

**6.** Pat Sierra holds original shares of Goldbelt stock, but does not allege that she is an elder. The lawsuit was originally brought by two shareholders, one of whom was an elder who did not own original shares. The original plaintiffs wrote a letter to then-presiding Superior Court Judge Walter L. Carpeneti and asked that their names be removed from the case. Judge Car-

peneti permitted the suit to go forward on documentary proof that the case was being pursued on behalf of a named plaintiff. Pat Sierra was named in place of the original plaintiffs. Because she does not allege that she is an elder, Sierra may not be a proper class representative to pursue a claim asserting unequal treatment within the class of elder shareholders.

Sierra's opposition, Superior Court Judge Walter L. Carpeneti granted the motion, and issued final judgment in favor of Goldbelt.

Sierra appeals.

## III. DISCUSSION

### A. Standard of Review

■ We apply our independent judgment in reviewing summary judgment decisions, which are made as a matter of law based on undisputed facts.[7] In addition, we apply our independent judgment to questions of statutory interpretation.[8] In applying our independent judgment, we adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[9]

### B. Issuance of Shares Without Consideration to Original Elder Shareholders

■ Sierra argues that Goldbelt cannot limit the elder benefit to original shareholders or provide the elder benefit to elders who are no longer shareholders of Goldbelt. She contends that Goldbelt's elder benefit is both under-inclusive—because it excludes present shareholders who were not original shareholders—and over-inclusive—because it includes original shareholders who have conveyed away their stock. Sierra argues that restricting eligibility to original shareholders violates AS 10.06.408(a) and corporate law generally. She concludes that the elder benefit diverts the wealth from Goldbelt's pres-ent owners in violation of principles of corporate law as well as ANCSA. She argues that although ANCSA preempts Alaska corporate law, and expressly allows discrimination in favor of elder shareholders, it does not allow discrimination in favor of original shareholders. She argues that to preempt state prohibitions against discrimination in favor of original shareholders, ANCSA must expressly trump state law.[10] Finally, she argues that as applied to original shareholders who no longer own stock, the Goldbelt elder stock program is contrary to the shareholders' contract—arising from the corporate charter and bylaws and from statutes and common law governing the corporate enterprise—which provides for ownership of corporate wealth on a pro rata basis. This, she claims, is an unconstitutional impairment of contract in violation of the Fifth Amendment.

We conclude that these arguments are unavailing.[11] As Goldbelt argues, ANCSA permits issuing elder stock without consideration.[12] Nothing in the language or history of the statute indicates that Congress intended to limit the power of Native corporations to issue such stock selectively only to elders who continue to own original shares of settlement common stock. To the contrary, Congress has expressed its intention that the ANCSA amendments be interpreted to effectuate their purpose in empowering Native corporations to identify and meet the specific needs of particular groups of Natives.[13] To

---

7. See Croft v. Pan Alaska Trucking, Inc., 820 P.2d 1064, 1066 (Alaska 1991).

8. See John v. Baker, 982 P.2d 738, 743 (Alaska 1999) (applying independent judgment to decide legal questions such as scope of tribal court subject matter jurisdiction and meaning of federal statute).

9. See Sielak v. State, 958 P.2d 438, 439 (Alaska 1998).

10. See generally 43 U.S.C. § 1606(h)(1)(A) (1986 & Supp.2000) ("Except as otherwise provided in this Act, settlement common stock of a Regional corporation shall ... (iii) vest in the holder all rights of a shareholder in a business corporation organized under the laws of the State.").

11. We do not reach Sierra's claim that the Fifth Amendment precludes reliance on any ANCSA provision, particularly 43 U.S.C. § 1606(g)(2), on her theory that it impairs the shareholders' contract rights with Goldbelt. Sierra did not preserve this issue in the superior court.

12. See 43 U.S.C. § 1606(g)(2)(C)(ii) (1986 & Supp.2000) (requirement that additional shares of stock be issued for such consideration as may be permitted by law "may be waived" with respect to stock issued to "Natives who have attained the age of sixty-five" or "other identifiable groups of Natives" under § 1606(g)(2)(B)(iii)(II)).

13. See 43 U.S.C. § 1601 note (1986 & Supp. 2000) (the Congressional Findings and Declaration of Policy for ANCSA Amendments of 1987 states: "[T]o ensure the continued success of the settlement and to guarantee Natives continued participation in decisions affecting their rights and property, the Alaska Native Claims Settlement Act must be amended to enable the shareholders of each Native Corporation to structure

effectively meet the needs of particular groups of Natives as Congress intended, Native corporations must have broad discretion to fashion elder benefit programs that meet the needs of elders. The amendment somewhat limits this discretion by prohibiting benefit programs that would aid "classes of beneficiaries" defined by reference to "place of residence, family, or position as an officer, director, or employee of a Native Corporation." [14] The class of beneficiaries relevant in this case, defined as elders who owned original shares of stock, does not fall within this statutory restriction. Moreover, in other parts of the ANCSA amendments, Congress has expressly permitted Native corporations to prefer the beneficiary class of original shareholders—further rebutting Sierra's suggestion that Goldbelt's preference for original shareholding elders was not authorized under the statute.[15]

As to including elders who are no longer shareholders in the beneficiary class, we conclude that this too was properly within Goldbelt's statutory discretion. One purpose of the ANCSA amendments was to permit stock to be issued to a new generation of Natives or Native elders.[16] Because ANCSA contemplated issuing shares to Natives who had not been among the original shareholders, ANCSA necessarily conflicts with traditional corporate law requiring that only current shareholders benefit.[17] Goldbelt correctly argues that "[i]ssuance of such stock would be an impermissible gift, were it not for the overriding provisions of ANCSA." Alaska Statute 10.06.353 provides that shares may not be issued until they are fully paid for, but 43 U.S.C. § 1606(g)(2)(C)(ii) preempts that provision. Alaska's corporation code expressly provides for preemption by ANCSA.[18]

In short, ANCSA authorized issuance of elder stock on these terms even though they would otherwise conflict with Alaska's corporation code. We conclude that, if Goldbelt's shareholders authorized issuance of the elder stock, Goldbelt's elder stock program was permitted under ANCSA and is therefore permitted under Alaska law.

---

the further implementation of the settlement in light of the particular circumstances and needs ...."); *see also Broad v. Sealaska Corp.*, 85 F.3d 422, 428 (9th Cir.1996) ("Congress intended the amendment to 'enable the shareholders of each Native Corporation to structure the further implementation of the settlement in light of their particular circumstances and needs.' ") (citation omitted).

14. 43 U.S.C. § 1606(g)(2)(B)(iii)(IV) (1986 & Supp.2000).

15. *See, e.g.,* 43 U.S.C. § 1606(g)(1)(B)(iii) (1986 & Supp.2000) (permitting Native corporations—when issuing new shares of settlement common stock to elders, new Natives or identifiable groups of Natives under § (B)(i)—to provide that such shares "shall be deemed cancelled upon the death" of the recipient). The Senate Report on the measure explained that "[t]his provision allows the Native Corporation the option of permitting new Native shareholders to participate in the Native Corporation on a fully equal basis as the original shareholders or to institutionalize historic interests of original holders of settlement common stock." S.Rep. No. 100–201 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3269. Thus Congress clearly contemplated the power of Native corporations to institutionalize the privileges of original shareholders, at least by limiting the relative rights and privileges of new and additional shares of stock authorized to be issued under the amendments.

16. *See, e.g.,* Alaska Native Claims Settlement Act Amendments of 1987, House Explanatory Statement, 133 Cong. Rec. H11933, *reprinted in* 1987 U.S.C.C.A.N. 3299 (explaining that the amendment "limits issuance of such stock for no consideration or less than fair market value to Natives born after December 18,1971, Natives who missed the original enrollment, or Native elders 65 years or older").

17. *See, e.g.,* AS 10.06.408(a). This subsection prohibits the setting of a retroactive record date, and provides:

To determine the shareholders entitled to notice of or to vote at a meeting of shareholders or an adjournment of a meeting ... or to determine the shareholders for any other proper purpose, the board of a corporation may provide that the stock transfer books shall be closed for a stated period not exceeding 70 days.

*See also* AS 10.06.015(a)(2) (providing that gifts to former shareholders are ultra vires acts that constitute waste of corporate assets).

18. AS 10.06.960(f) provides:

Notwithstanding the other provisions of this chapter, a corporation organized under the act [ANCSA] is governed by the act to the extent the act is inconsistent with this chapter, and the corporation may take any action, including amendment of its articles, authorized by the act, and the action is considered to be approved and adopted if approved under the act.

## C. Adequacy of Proxy Solicitation

■ Sierra next argues that Goldbelt failed to disclose material facts and misled shareholders with false statements, and that the 1997 election approving the elder benefit was therefore invalid. She also asserts that Goldbelt violated 43 U.S.C. § 1629b(b)(2)(A) because the proxy statement did not set forth the text of the proposed amendment or the board's resolution.[19] Because the court is evenly divided on both issues regarding the adequacy of the proxy solicitation, the court affirms, without substantive discussion, the summary judgment entered by the superior court.[20]

Two members of the court, Chief Justice Fabe and the author of this opinion, conclude that the proxy statement's failure to disclose the projected expense of the elder benefit proposal was not fatal. They reason that it is not necessary to include speculative or unreliable—and therefore potentially misleading—information in the proxy statement.[21] They would hold that the circumstances here made it impossible to predict whether the new board that would be elected in 1997 would choose to implement the elder

stock program to the extent the prior board proposed, especially given the new board's access to updated financial data.

The other two members of the court, Justices Matthews and Bryner, have a different view as to this issue. They believe that proxy solicitations may not omit material facts, that is, facts which would likely be considered important by a reasonable shareholder in deciding how to vote.[22] The board in the resolution authorizing the amendment to the articles stated that it "anticipates that the redemption price will be $10 per share so that each elder to whom 100 shares are issued would be entitled to a payment of $1000." Justices Matthews and Bryner would not reach the issue of the adequacy of the proxy solicitation independent of the requirements of § 1629b(b)(2)(A) because compliance with that subsection would necessarily make the proxy adequate under the *Brown v. Ward* standard. If they were to consider the adequacy of the proxy solicitation independently of § 1629b(b)(2)(A), they would hold that whether the board's resolution statement quoted above likely would be considered important by a reasonable share-

19. 43 U.S.C. § 1629b provides in part:

(a) Coverage
Notwithstanding any provision of the articles of incorporation and bylaws of a Native Corporation or of the laws of the State, except those related to proxy statements and solicitations that are not inconsistent with this section—
(1) an amendment to the articles of incorporation of a Native Corporation authorized by subsections (g) and (h) of section 1606 of this title;
....
shall be considered in accordance with the provisions of this section.
(b) Basic procedure
(1) An amendment or resolution described in subsection (a) of this section may be approved by the board of directors of a Native Corporation in accordance with its bylaws. If the board approves the amendment or resolution, it shall direct that the amendment or resolution be submitted to a vote of the shareholders at the next annual meeting or at a special meeting (if the board, at its discretion, schedules such special meeting). One or more such amendments or resolutions may be submitted to the shareholders and voted upon at one meeting.
(2)(A) *A written notice (including a proxy statement if required under applicable law), setting forth the amendment or resolution approved pursuant to paragraph (1)* (and, at the discretion of

the board, a summary of the changes to be effected) together with any amendment or resolution submitted pursuant to subsection (c) of this section....
(Emphasis added.)

20. *See Barrett v. Era Aviation, Inc.*, 996 P.2d 101, 104 (Alaska 2000) (citing *Dimmick v. State*, 473 P.2d 616, 621 (Alaska 1970)).

21. *See, e.g., In re Rockefeller Ctr. Properties, Inc.*, 184 F.3d 280, 290 (3d Cir.1999); *Krauth v. Executive Telecard, Ltd.*, 890 F.Supp. 269, 288–89 (S.D.N.Y.1995); *In re Brown Co. Sec. Litig.*, 355 F.Supp. 574, 584 (S.D.N.Y.1973) (holding that omissions of value of timber lands involved in proposal that required shareholder approval was not misleading in part because "[i]t is clear, as a matter of law, that a company should not speculate as to the value of its assets in a public document"); *see also Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (3d Cir.1972) ("Ordinarily the SEC and the courts discourage presentations of future earnings, appraised asset valuations and other hypothetical data in proxy materials.") (citations omitted), *overruled on other grounds by Kershner v. Mazurkiewicz*, 670 F.2d 440 (3d Cir.1982) (en banc).

22. *See Brown v. Ward*, 593 P.2d 247, 250 (Alaska 1979).

holder in his or her choice of whether to vote yes or no on the proxy card was at least a question of fact inappropriate for resolution by summary judgment.

■ Likewise, as to the second issue, Chief Justice Fabe and the author of this opinion would also affirm. They would hold that the proxy statement satisfied § 1629b(b)(2)(A). In their view, that subsection did not require the proxy statement to include a financial projection that would have been potentially inaccurate. Similarly, they conclude that the proxy statement adequately set forth the amendment or resolution.[23]

Justices Matthews and Bryner disagree. They would hold that the proxy statement did not satisfy § 1629b(b)(2)(A) because it did not "set forth" the board's resolution. They note that a mere summary of the changes to be effected is insufficient to satisfy the requirements of this subsection. The subsection states that a summary may be sent in addition to the resolution, not as a substitute for the resolution. Congress has used the word "and," not "or," in reference to the summary.

■ All four members of the court are unpersuaded by Goldbelt's argument that the proxy statement did not have to satisfy § 1629b(b)(2)(A). Goldbelt asserts that ANCSA's requirement that shareholders be sent a written proxy "setting forth the amendment or resolution approved pursuant to paragraph (1)" of § 1629b(b) applies only to amendments authorized by both subsections (g) and (h) of § 1606, but not to those amendments authorized under § 1606(g) alone. Goldbelt's reading of the statute is grammatically permissible. But it is contextually implausible for two main reasons. Goldbelt has not identified any logical reason why Congress might have intended to free this type of amendment from the solicitation requirements of § 1629b(b)(2)(A). And the legislative history found in the House Report on the proxy provision suggests that Congress intended that the solicitation requirements apply to amendments allowing corporations to issue elder shares under § 1606(g).[24]

## IV.  CONCLUSION

We unanimously agree that Goldbelt's elder stock program was authorized by ANCSA, and was not precluded by Alaska corporate law, so long as Goldbelt's shareholders in 1997 properly approved the program. The court is equally divided as to the remaining issues, whether the proxy solicitation was adequate or violated federal law. The court therefore AFFIRMS the judgment entered by the superior court for Goldbelt.

---

**23.** See Alaska Native Claims Settlement Act Amendments of 1987, S.Rep. No. 100–201 (1987), reprinted in 1987 U.S.C.C.A.N. 3269 ("Under subsection (b)(2)(A), the corporation is required to provide its shareholders with disclosure materials concerning the amendments and resolutions authorized to be voted upon by this Act.").

**24.** See S.Rep. No. 100–201 (1987), reprinted in 1987 U.S.C.C.A.N. 3269 ("The major issues subject to the procedures of this section are the termination of alienability restrictions, the issuance of new stock by Native corporations and the extension of dissenters' rights to the minority shareholders under certain circumstances.").